Our final case for argument this morning is Mussi v. Fontes. Mr. Pinkert. Good morning. Mark Pinkert for the appellants. I'd like to reserve four minutes for rebuttal. The plaintiffs in this case alleged three concrete and cognizable injuries from the alleged violation of the NDRA and the consequence of hundreds of thousands of ineligible voters on the rolls. The first injury that they face is a substantial risk that their individual votes will be diluted. That is, their own votes will count less or will be less effective because of the increased risk of improperly cast ballots. That is a concrete injury and is also one that is a predictable consequence of the NDRA violation and is well supported with factual allegations, especially at the pleading stage. Second, the plaintiffs are experiencing a present loss of confidence in the integrity of elections. So, just like an environmental plaintiff who loses aesthetic enjoyment when a government policy will damage a site that they have visited and plan to visit again, the plaintiffs face a similar psychological harm when they visit the voting booth, as they have done in the past and plan to do again. They're politically active, civically engaged, and so their loss in confidence in the election is no less constitutionally cognizable than the environmental plaintiff. Third, the plaintiffs have devoted resources toward poll monitoring, get-out-the-vote, and voter education activities, all to mitigate the effects of the NDRA violation. And so, like an organization that is already engaged in a particular mission, they, too, are deeply engaged in election law and policy, and so this is core to what they do as part of their mission personally. And the NDRA, the violation has caused them to divert more resources toward that cause. There is no basis to distinguish between an organization and an individual. If that type of standing suffices for an organization, it does as well for an individual. Maybe starting with the vote dilution theory, can you address our decision and election integrity project? Because as I read that, and particularly footnote 13, and it seems to say that this kind of vote dilution claim is a generalized grievance that isn't enough, isn't sufficiently concrete or particular for standing. So how do you deal with that?  Well, in the first appeal of the election integrity project case, the Ninth Circuit actually held that the organization there had standing based on the same theory of diversion of resources for poll monitoring and things like that. On the second appeal, the decision was on the merits. The dicta in the footnote does seem to suggest that, but I would say this is not a generalized grievance because the plaintiffs are concerned with the power of their own vote, that it's going to count less in the election because of improperly cast ballots. And that is concrete and personalized to them, and the Supreme Court has said over and over again, from Gill versus Whitford, Gray versus Sanders, Anderson versus United States, and of course, Baker versus Carr, your interest in the power of your vote is a concrete and personalized. And could they show that if they suspected that there was one person on the rolls that didn't belong on the rolls? I think so, Your Honor. The Supreme Court has said that even a trifle or a nominal damage suffices. And would they have any obligation to show that the person that they suspected was either no longer living or no longer living in Arizona didn't live in their precinct, or it's just a sufficient that they might vote in a senatorial, U.S. senatorial race or a gubernatorial race? So I do want to make sure that the injury and fact analysis and the merits question are analytically distinct. If there's not sufficient evidence that there's improper voter roll maintenance, they don't have a cause of action. If they can show that the violation is causing ineligible voters to remain on the rolls, that increased risk dilutes the power of their vote. And I would... Well, the risk doesn't dilute the power of the vote. The possibility, if demonstrated as having converted into reality, that ineligible people voted would dilute the vote. But the fear that somebody who might not be eligible votes, that doesn't dilute anything because unless the other person votes, there's no dilution.  So I... So... Well, that matters here. Yes. Because we're... What sense of... What evidence of impending imminent harm is there since there seems to be a complete void with regard to whether ineligible people have, in fact, voted or how great the risk is? So I think there's lots of evidence. First, I would just say that the Supreme Court in the Ninth Circuit doctrine says that a future injury based on contingent future events is still cognizable, provided you... You get... It's got to be more than speculation. More than speculation. There's a series of possibilities, and where is the evidence of ineligible people voting? I mean, Arizona has a serious record about that. Did a deep dive for the election in 2020, found no such evidence. So where's the evidence here that suggests that there's really a problem? Sure. So I would start with the NVRA itself. Congress wanted to increase access to voter registration, but it also recognized that doing that could lead to bloated rolls, which causes voter fraud. So the very... It doesn't cause voter fraud. It maybe offers the potential for it, but you've only got the first of what is a series of events. And we've seen nothing in the way of evidence so far or any basis, any factual allegations that give us a plausible reason to think that there's a case there, that in fact, ineligible people have voted in any number. Well, again, I think Congress... We're saying the risk that that will happen, that fraud will take place, is increased by ineligible voters on the rolls. Congress recognized that. The Supreme Court in the Crawford case in 2008 said Indiana enacted a voter ID law, and the Supreme Court upheld it, saying that Indiana had a compelling interest to prevent fraud because, by their own fault, they had left too many voters on the rolls. They did not have a sufficient maintenance program. And in the opinion there in 2008, the court said that is a compelling interest, that if you have unmaintained rolls, there is an increased risk of fraud. We don't have to wait for that harm to take place to have standing to bring a case, a future injury... You don't need to wait for it to take place, but you do need... I mean, maybe I'm just repeating what Judge Clifton said. You do need to allege facts that support a plausible inference that it is more than speculative. And so I'm looking at paragraph 29 of your complaint, and it says, because the Secretary does not maintain accurate rolls, ineligible voters have an opportunity to vote, risking the dilution of plaintiffs' legitimate votes. Is that the allegation that you have on this point, or is there something else in the complaint? Because as I read the complaint, that was it on this point. Well, we cited the Baker v. Carr report, which, excuse me, the Carter-Baker report from 2004, which talks about how unmaintained voter rolls invite fraud through forgery, through impersonation, through duplicate votes. And again, we rely heavily on the Department of Commerce case from 2019, where the Supreme Court said, there are third parties who, in response to a citizenship question on the census, they may, in the future, decline to respond to that, even though that would be unlawful. That would be unlawful third-party conduct. And even though it was sort of an irrational fear, because the government cannot initiate enforcement actions based on their census responses, because that remains confidential. So the Supreme Court didn't say, you need to prove that it's certainty that these third parties will act unlawfully. You can have a predictable third-party consequences based on supporting evidence, which they had. And that was on a trial record. Here we're just at the pleading stage. We don't need to show certainty. We just need to show plausible inference. And I think if we take Congress's own legislative findings and purpose, if you look to the legislative history, it talks about unmaintained voter rolls increasing the risk of fraud. The Supreme Court in Crawford, and again in the Husted case, talking about states having a compelling interest to prevent fraud through voter maintenance, the Carter-Baker report and the expert report that we appended, at the pleading stage on a facial attack, it is at the very least plausible that that is a potential outcome of unmaintained voter rolls. Well, plausible, it is a potential outcome, doesn't make it a plausible outcome. And with no evidence suggested that I can see in the complaint beyond the rather general allegation that Judge Miller pointed to, what makes this anything more than theoretical and speculative? I mean, you've got to have something more than speculation. Lots of cases talk about that. And so far, I'm not hearing anything other than it's a possibility. I think it's a likely possibility based on— I was raised in Chicago. I understand vote fraud. But that doesn't mean that the fact that there are additional names on the list means in fact there's a plausible problem, as distinguished from the fact that the efforts of Congress to make sure people don't get pushed off too early leave more names on the list than probably you'll want to have voting. But it doesn't tell us that any of those additional names actually vote. So I guess I don't know of any other way to prove that something is certainly going to happen down the road. It's certainly plausibly going to happen. And I think it's plausible because Congress recognized it's a distinct possibility. They're legislating legislative findings and purpose, the Supreme Court, and studies. So until the elections take place— If you had a history that would have made this far more compelling. If you had evidence from the 2020 election, 2016 election, 2012 election, whatever, that people were actually voting who were not eligible, that might be powerful evidence to say, look at the number of people that we think are on these rolls that shouldn't be. And given past history, we can assume that some percentage of them are going to be voting. But I don't see anything here. All you've offered is a risk that someone might vote who shouldn't vote in the future. Well, again, I would point again to the Department of Commerce case where the Supreme Court didn't require— Not even a voting case. Right. But that was dependent on unlawful third-party behavior. Here we're saying it's predictable and plausible based on what Congress, the Supreme Court, and academic studies and what commissioned reports have said. Now, in the Crawford case— It's not plausible if all of the people who are on the rolls are dead. Well— If they moved out of state, maybe. If they're dead— We don't even have—we don't have any idea where these folks are. So actually, if there are deceased voters on the rolls, that is an opportunity for improperly cast ballots through forgery, through people sending those in. I'll just give you— Any evidence of that in the past. So in the Crawford case, the court talks about deceased voters and— Mr. Stevens is also from Chicago. He knows the history. But he knows the history and leaves a concern. But at issue there is the voter ID law. And I can understand a more—a tighter connection between what's at stake there and this pretty general allegation that somehow the Secretary of State has mismanaged the process, so something ought to be done about that. Do we have anything that suggests that, in fact, there have been people not lawfully, properly eligible to vote who have, in fact, cast ballots in Arizona? Well, it is not in the record, but the Arizona Attorney General has posted examples of convictions where people have forged signatures and cast absentee ballots. So there are—I mean, we could put that more affirmatively in the complaint. We don't think that's necessary because the plausibility is established by studies, by Congress, by the Supreme Court. And so I just—to get over the plausibility threshold at this—on a facial attack at the pleading stage, I don't think it's necessary to go back and to put in—now, if you think that's the case, we can put it in. There have been federal convictions as well. And I can just give you an example, Judge Bybee, if it's not in the record. My wife's grandfather passed away before the 2024 election. He was still registered to receive an absentee ballot. He got that in the mail. My mother-in-law picked it up, and she has very strong views on politics, and she said, oh, I could send this in and sign his name. Now— I feel like I need to give her Miranda warnings right now. Well, as much as I would like to put my mother-in-law in prison, she did not. I talked her out of it. She didn't do it. But that can happen. And it is a plausible consequence. And at this stage, without having taken discovery and knowing more about what's happening behind the scenes, I think— You do know that these—we were live streaming this argument. Yes. I'll stand by what I said there. So the other—I just do want to direct you to the Hall v. D.C. Board of Elections case. I think this is another one that's very important on this question of vote dilution. Judge Randolph's opinion for the D.C. Circuit held that voters in D.C. had standing to challenge a D.C. law that would have allowed noncitizens on the rolls. Well, there's no real doubt about, is somebody going to do something? Will noncitizens vote? In that case, yeah, here's a ballot. You're allowed to vote. And the citizens complained that expansion of the electorate was improper. Right. Well, the fact that dilution would follow that change in law was pretty easy to see. The problem we have—and we're bound by our court's case law in any event—but the problem in our case is that it's hard to see where the dilution actually happens. You get a handful of convictions, but not enough that are going to ever change anything. And all of the theories seem to rest on the same foundation. You outlined at the beginning, you've given us in the briefing the variations on the theme about confidence and integrity. But all of that—or an expenditure of money—but all of that rests on the likelihood, the plausibility of the allegation that people who shouldn't be voting are going to vote and have voted in the past to give us some historical record. And so I understand the distinction you draw in the Hall case, but it seems to me that just isn't what we're dealing with here, because there's no question there but that non-citizens were going to be allowed to cast their ballots, and here that's still open to question. So I would say that that case is only a difference of degree, because there, there's still—it's possible that none of the non-citizens would decide to vote. It's highly unlikely that we're allowed to vote. Right. And I'm saying that here, where you have hundreds of thousands of ineligible voters on the rolls, it is plausible that someone is going to take advantage of that and cast improper ballots. So even though it's a difference of degree— More than a handful of cases, given that past history has not turned up a record like that. And again, Arizona's got history there. And I don't want to repeat the sources that we rely on, the NVRA, Congress, but I would also say that to the extent that those improper ballots are cast, it's also very hard to detect. So the convictions are probably just part of a larger—and I see that I'm running low on time, so I'll reserve— You want to reserve the vote. Thank you. You may. Ms. Carlson. Good morning, Your Honors. May it please the Court, my name is Kara Carlson, and I represent the Arizona Secretary of State. This Court should affirm the District Court because plaintiffs lack standing. To satisfy the irreducible constitutional minimum, plaintiffs must demonstrate injury, causation, and redressability. They have not. In fact, they expressly deny that their assumption of bloated voter rolls has led to fraudulent votes. They have not made that showing. They have admitted there is at most a risk of, or an opportunity for, illegal votes to be cast. And assuming co-counsel's argument, if his mother-in-law had done something different and cast that ballot, there would be no way to connect that allegation of a fraudulently cast ballot, even assuming it did get tabulated, that it made it through the signature verification process. It wouldn't be attributed to the Secretary of State's voter rolls, voterless maintenance. It would be attributed to the interplay between Arizona's early voting procedures, which allow early voting 27 days before the election, and perhaps when his father-in-law was deceased, and then a theoretical illegal decision to cast that vote, and then the county's failure to catch that illegally cast ballot, despite the multiple steps that are in place to prevent voter fraud in this state. And I also, Judge Miller brought up paragraph 29 in the complaint. And not only is that speculative, it also rests on this legal conclusion, the legal Secretary of State is failing to comply with NAFRA. The entire complaint hinges on that, and that's a legal conclusion under Iqbal, and that is not enough. They don't bring actual facts, they don't bring actual allegations that there have been these illegal votes being cast. And that leaves the rest on the number of names on the rolls. Correct. And I will acknowledge, at first blush, I sat there and said, wow, those are a lot of names representing a pretty big percent of the population. Is there a problem there? So why shouldn't we think that's a problem? There is not a problem there because, first of all, as a bare legal conclusion, this court is allowed and, in fact, must, under Article III jurisprudence, to determine whether that is just a naked legal conclusion or whether there's actual plausibility there. And when you... Well, that's a fact. The number of names on the roll compared with the population is itself a fact. Does that fact make the allegation of the legal consequences sufficiently plausible? Why is it we shouldn't be concerned to say that, and I've confessed, I've forgotten the numbers, that this great big number in terms of a percentage of the population isn't a source of concern, isn't a reason to think plausibly there's a problem? No, because that's actually required under the NVRA. So and included in the briefing, a little thought experiment of if you had one voter, one person registered in County A, and then you had that voter moves out of the county and you have voter B move in, under NVRA, you would have to include voter A on that voter registration roll for two additional cycles. Now, does that mean that the voter roll is twice as big as it should be and that that's attributable to the Secretary of State? No, it's a function of the law to address what Congress had, you know, the the countervailing interests of ensuring that voters are not removed from the rolls improperly, were not removed before they should be, while also trying to address maintaining. So the question, I mean, I understand what you just relate, because I experienced it in the night, I forgot what year that was passed, but after NVRA was passed, the Hawaii where I'm from, voter rolls expanded dramatically because they used to purge pretty aggressively in Hawaii. If you didn't vote in a two-year cycle, off you go. It made it easy to re-register. But because of the federal statute, a lot more people. And so I understand how that phenomenon works. Is there a basis to suggest, as the plaintiffs have in their complaint, that the Secretary of State is not being as aggressive as he could be in purging up to the standards permitted by the federal statute? And so that's, I guess, why we're here. The plaintiffs allege that, okay, yeah, you can't purge as much, perhaps, as Hawaii used to and maybe Arizona used to, but you can purge at a certain point, and the allegation is the Secretary of State has not done that. Why isn't that a plausible allegation? Well, I think in order to evaluate whether that's plausible, you'd have to look at Arizona in comparison, in its compliance, in comparison to the rest of the country. And Arizona overwhelmingly is a leader, actually, in NAVRA compliance, and you can look at the publicly noticeable Election Assistant Commission reports, and again, their expert relied on this. You can review it according to Rule 201, and it does not violate the 12B1 standards. It's a facial attack, yes, but you are allowed to look at those public documents to determine whether or not plaintiffs' claims here are plausible. And they say in paragraph 29, or they say in a number of paragraphs, that the Secretary does not conduct list maintenance. That is not true, and this Court is not bound to consider that sweeping, broad generalization when we have a long track record of publicly available documents that are subject to judicial notice, that demonstrate that Arizona actually removes hundreds of thousands of people from its voter rolls every two years. We know this. We know that Arizona removes more deceased people, they removed 108,000 deceased people. Plaintiffs also rely on the 16165M letters to make the allegation that the Secretary concedes that there is no NAVRA compliance, and that is just not true. Section 16165M was added in 2022 by the state legislature. It has nothing to do with NAVRA, it postdates it by 20 years, and it's just not a concession of anything other than the Secretary of State was ordered to produce, you know, identify the number of people every quarter who were removed from the rolls because of certain changes, so death, which is conceitedly one of the reasons that you can be removed under NAVRA, but there are additional reasons, including juror questionnaires. That's a unique attribute of Arizona law that the Secretary has to report to the legislature, and to the extent that process remained under review, it was not because the Secretary, as plaintiffs alleged, had not been conducting this review or these removals for decades. It was because the law was enjoined by this court. So it's just, when you look at the record below, it is abundantly clear that plaintiffs' claims are based on speculation and hyperbole. But counsel, what kind of a complaint could plaintiffs bring that would satisfy the Secretary of State? A complaint that plaintiffs could bring that would satisfy Article III standing would be one that alleged that they were improperly removed because of, you know, they were actually alive, and the Secretary of State removed them because they were dead. That's not a vote delivered in a completely different case. I should have been more precise. What kind of a vote dilution case could be brought where the Secretary would admit that there was standing to bring the suit? You could contest on the merits, but at least for Article III purposes, the Secretary would concede that it satisfied the pleading standards. Well, I think that that would be one under the 14th Amendment and redistricting cases. The ones where that has been established, here they're bringing it under a specific federal statute. And the problem is that this court has the authority to address a lot of things, but it does not have the authority to address everything. And you know, that would really eviscerate the heart of the constitutional separation of powers and accountability of state elected officials. So just to give an example of maybe a possible answer to Judge Bybee's, I mean, suppose we had a complaint with, you know, very specific factual allegations that because there are ineligible, I know you don't think that this is true, but imagine the complaint alleged that, you know, because there are this number of ineligible people still on the rolls that, you know, we hear is some evidence that, you know, a thousand of them are voting in every election. And therefore there is a non-speculative allegation that the challenged practice is, you know, creating a real prospect of ineligible people voting. Would that be enough? I think that would be a significantly harder question. I think you would still have to add the allegation, and I think that you could in that case, of an additional 14th Amendment violation, but what you've done there is what plaintiffs have failed to do here. What is the 14th Amendment violation that you would need to add? What does that look like? That their votes are being actually diluted. Their claim is solely based on an alleged violation of NAVRA. But I thought your, I guess I had understood your sort of first line legal position to be that if the claim is just all eligible voters as a class are having their votes diluted by a bunch of ineligible voters, that you took the position that that was a generalized grievance. And so, so even if you had lots of evidence that that dilution was in fact happening, you don't think that would be enough for standing? Is that right? I think that under Election Integrity Project, which was one of the first cases you asked opposing counsel about, that yes, you would, under binding Ninth Circuit precedent, you wouldn't be allowed to, you know, there wouldn't be standing there even if you showed, made some demonstration. You started talking about thousands. I think that the farther afield you, you know, the larger the number of ineligible voters, the closer you might get to constitutional harm. The other issue that I would look at. And the constitutional harm as opposed to, you know, you're distinguishing between just a violation of the statute and the constitutional harm. And so there's constitutional harm if thousands of ineligible people are voting, but not if, I mean, suppose they had, I mean, suppose they had very clear, unambiguous, non-speculative allegations that established that because of this, you know, the practice that they're challenging, one ineligible voter would cast a ballot. Like, that's not enough, but some larger number is? Is that your view? My view is that it would be a harder case. I still think that this court, a NAVRA challenge to the voter list maintenance procedures is not the proper vehicle to assert those claims. We have election challenges in Arizona law. We have mandamus claims where if plaintiffs believed that the Secretary of State, that they were doing list maintenance the way they were supposed to, they could file a mandamus action in state court to require that proceedings to happen. They haven't done those things, and that's the proper venue, not to go to federal court with these claims that because of alleged additional voter registration, therefore, there could be an opportunity in the future for there to be illegal votes that are actually counted. Again, Lake v. Fontes, also from the Ninth Circuit, countenances against that chain of hypotheticals, and that was an even closer case in terms of it was allegations that the voting machines could not be trusted to tally votes, and the Ninth Circuit said that chain of speculation was not enough, and here we are taking an even additional step back saying voter registration practices are not what they need to be, allegedly, and therefore, there could be fraudulent votes, and therefore, those fraudulent votes could be counted, and therefore, I am concerned. If that's the case, then there is, it is difficult to imagine an Article III, it is difficult to imagine what would remain of Article III if that's the case. If you could just have this chain of events or just a naked assertion of concern based on these inferences. Well, Article III would be satisfied by factual allegations that made the claim plausible. I mean, we were off briefly, we should leave election integrity issues to state law, mandamus actions and so forth. That's an entirely different path. If, in fact, plaintiffs, and I'm not limiting it to this case, if a set of plaintiffs in some case could come in and say, we have these factual allegations that make plausible a claim that this election, and statewide maybe gets harder, but I mean, look around this crowd. Everybody around here was conscious the year 2000, and we remember the year 2000, Florida, one of the biggest states in the country, held the whole country up for, what, a month trying to figure out who the next president was. Sometimes elections turn out to be very close, and so I'm not sure that Article III is meant to be an impenetrable barrier to being able to come in if you have factual allegations that make a claim plausible that this is going to dilute my vote such that I'm materially affected by it. It might turn the outcome of the election around. Now, you've been asked what number of votes, it's hard to say, but I forget what the number was in Florida, in the end there were a couple hundred or so forth. So if you could come in and say that, look, we got dozens of suspicious ballots in this particular place, and I got facts that make plausible an allegation that leaving these names on the rolls of people that weren't actually eligible to vote presents this risk, why wouldn't that be enough for Article III standing? Well, actually, that was enough in one of the Public Integrity Legal Foundation lawsuits, but what they had there, which plaintiffs don't have here, is they had a list of people who were on the voter registration rolls in, I want to say Michigan, Michigan, or Wisconsin. One of those cold states. Yeah, unlike here. And then they had a list of people who were dead, and so they could demonstrate that there were thousands of people who were simultaneously on the registration rolls and were dead. Under NAVRA, there is no safe harbor provision for these people. So that would be enough without any evidence that anybody who was dead had their ballot used, and that would be sufficient? I think that would be sufficient to get them past the pleading stage under the... That seems to be quite a concession, given the question I asked you a few minutes ago, but that's curious. Okay. So, in Election Integrity Project, there was also additionally a question about whether the state accurately maintained the voter rolls. This court said that that was not something, because it wasn't based on a cognizable characteristic of those alleged improperly maintained voter rolls, the plaintiffs still did not have standing. So, for those reasons, if the court has no further questions, I would ask the court to affirm the district court below. All right. Thank you. Rebuttal? Thank you. Judge Miller, your hypothetical, I think, was illuminating, where you asked, well, what if the plaintiffs could show that people actually cast improper ballots based... Because there were ineligible voters on the rolls, they took advantage of that. That's exactly the problem, that if we have to wait to the election, then the injury is no longer redressable. And so, at that point... What about evidence from past elections? The allegation that there have been bloated voting rolls isn't brand new. The statute wasn't passed last year. Do we have any evidence or allegations based on facts from past elections that, in fact, there are people casting votes or other people casting votes in the names of people who aren't properly entitled to vote? And that's what seems to be missing from this complaint. So, we filed our lawsuit in 2024. And so, before any election... So, we're in between election periods. So, the voter rolls at that point, we're looking at a snapshot at that time. And it's the risk from the thousands of ineligible voters at the time. As far as past examples of fraud, again, it's not in the complaint. We don't think it's necessary to get over the plausibility hurdle. But the Arizona AG... Well, stop. Because how is it not... I mean, if your claim is vote dilution, then unless you have improperly cast ballots, there's no dilution. You don't have any allegation that's plausible of dilution. You've got your front end saying there are lots of names on the rolls that shouldn't be. But your theory is dilution or variations on a dilution theme. And if I haven't had an improper ballot cast, you don't have a plausible allegation of dilution. Again, I think Congress's conclusions in the Supreme Court and the Carter study... There was a President Obama commission to study that. That's not in the record. But there are lots of studies that talk about examples of convictions and just schemes based on ineligible voters on the rolls. Those are what's exploited. And I just want to run through very quickly some of this court's precedent on predictable effects of government action, where at the pleading stage, the burden is very modest. Judge Bybee in San Francisco versus UCSIS, you said predictable effect of government action on third parties that's predictable based on the evidence we put forward. Judge Miller in the solar energy case and in the Association of Irritated Residents. Judge Watford in the O'Hanley versus Weber case said you could have standing at the pleading stage even if there's several twists and turns. In City of Oakland versus Oakland Raiders, Judge Tashima said that this is somewhat speculative and a long and windy chain, but that's sufficed. I think and to your question, Judge Bybee, I don't think there's another complaint that could possibly survive under the standard. We've put forward allegations that have to be assumed that the claim on the merits assumed true when you're looking at the standing question. And we're talking about $500,000 to $1.2 million. Supreme Court has said it's got to be plausible. Yes. Just saying this horrible thing might happen doesn't make the allegation plausible. That's the burden we have to deal with. We have evidence at each stage of the chain that I've talked about repeatedly, but in Clapper, for example, there were clean breaks. On an evidentiary record, there were clean breaks in the chain. We don't have that. At each stage, we have plausible allegations. Thank you very much. Thank both counsel for their arguments. The case is submitted and we are adjourned.
judges: CLIFTON, BYBEE, MILLER